UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMPREHENSIVE HEALTH ACADEMY, LLC,
d/b/a COMPREHENSIVE HEALTH ACADEMY
SCHOOL OF PRACTICAL NURSING, *et al.*

Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.*

Defendants.

Civil Action No. 1:06cv01050
(RBW)

### SECOND DECLARATION OF KAREN SCIPIO-SKINNER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I, Karen Scipio-Skinner, under penalty of perjury, declare as follows:

1. I have reviewed Plaintiffs' filings in Opposition to Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment, including Plaintiff's (sic) Statement Of Material Fact As To Which There Is No Genuine Dispute ("Plts' Statement") and the Declarations of Sonny Oboh ("Oboh Decl." and Michael Adedokun ("Adedokun Decl."). The purpose of this Second Declaration is to address some of the misleading and erroneous statements in Plaintiffs' filings.

2. In mid-May 2006, the DC Board of Nursing ("BON" or "the Board") requested that the Office of the Attorney General for the District of Columbia ("OAG") prepare a Notice of Intent ("NOI") to withdraw initial accreditation ("NOI") of Plaintiff Comprehensive Health Academy ("CHA" or "Comprehensive"). Preparation of the NOI takes some time since OAG must review all relevant documents in support thereof. An NOI to deny full accreditation was sent to the Board for service on CHA on September

15, 2006 and was served on CHA on September 18, 2006. A copy is attached hereto. Service of the NOI commences the administrative process pursuant to which CHA may challenge the decision of the BON and also entitles CHA to a hearing. *See* NOI.

3. The representation in Plts' Statement and the Oboh Decl. that "a school's pass rate is the only objective standard by which it can be measured" is not true. For example, the provisions of section 5606.4 set forth eleven (11) criteria for the Board to consider in determining whether to withdraw accreditation or reduce a program to initial accreditation. Failure to maintain the required NCLEX pass rate is only *one* of the reasons for a program not to be accredited. Section 5606.4 (g). Also section 5603.2(c) makes clear that to receive and maintain full accreditation, a program must meet and maintain a demonstrated continued ability to meet the standards and requirements of Chapter 56, of which the pass rate is just one criterion. And section 5607 lists all the requirements for practical nursing programs.

4. The Board does not rank nursing programs. Therefore, the representation in Plts' Statement (¶4) describing CHA as "number one" is not correct.

5. The representation that CHA has never been advised that it failed to comply with the "Rules for Accreditation" (Plts' Statement at ¶12) also is contrary to the documented findings of the Board. For example, on August 2004, a report was sent to CHA identifying areas that needed to be addressed. CHA responded in October 2004 and another report was sent by the Board focusing on their continuing "deficits and omissions." As stated in my First Declaration (at ¶20), at the May 2006 Board meeting, the Board voted to deny accreditation based on the following deficiencies: (1) lack of data of students who enter, progress and graduate from the program; (2) lack of evidence

of clinical competencies prior to entering the clinical setting; (3) lack of faculty in test design and evaluation only done by the nursing director and program administrator doing primary design; and (4) lack of consistent formative evaluation during the program to identify at-risk students for academic failure.

6. As for Plaintiffs' comments that the UDC School of Nursing is a "competitor" of CHA, the District of Columbia has six LPN programs accredited by the Board. Of the six, UDC is the only school that is not privately run. UDC is a designated District of Columbia center for workforce development and, therefore, its funding comes from the government as well as from student fees. As a government entity, "competition" from private programs is not an issue for UDC since it is not solely dependent on student fees for its programs.

7. Defendant Donna Minor is a faculty member of UDC's professional nursing (RN) program, not the LPN program. She does not work for UDC's practical nursing program and she is not Director of Nursing at UDC as represented by Plaintiffs.

8. Contrary to the statements in Plaintiffs' filings (including its Statement and the Decls. of Oboh and Adedokun), CHA's Qualified Nurse Administrators ("QNA") were not "approved" by the Board. The Board does not "approve" QNAs but, assures that QNAs meet the regulatory requirements. Particularly for new programs, such as CHA, the Board will meet with candidates to determine their ability to administer a newly established program and to meet the criteria of 17 DCMR §5607.3(c).

CHA has not been altogether forthcoming with respect to the appointment of various persons to fill the position of QNA. Prior to Mr. Adedokun's appointment, the only notification the Board received concerning a QNA for CHA was a letter dated

October 2003 notifying the BON of Dr. Green's appointment. In January 2004, the BON received a letter from CHA requesting an investigation into the conduct of Dr. Green. Since Dr. Green only was in the position of QNA for a very short period of time, the BON did not have an opportunity to meet with her, but representatives did speak with her by phone.

After Dr. Green left CHA, the BON was informed (not in writing) that Ms. Meena Kumar was the QNA, but that Ms. Langham was functioning as the QNA (Ms. Kumar had a MSN; Ms. Langham did not). In May 2004, the BON sent CHA a letter requesting clarification of the situation and requesting the QNA's resume which never was received. In June 2004, Ms. Langham submitted a letter of resignation to CHA which was not communicated to the BON. In July 2004, the BON sent Ms. Langham a letter requesting a site visit. The BON then was informed by Ms. Langham, in an email dated July 18, 2004, that she had resigned and also was informed (but not in writing) that Adedokun was the Acting QNA. It was the BON's understanding that Adedokun would be the acting nurse administrator while CHA searched for a permanent QNA.

Mr. Adedokun was the acting QNA during the August 2004 site visit. As discussed below, in ¶9, the Board's Nurse Consultant, who was not Ms. Minor, had serious reservations about his ability to perform the duties of a QNA.

In October 2004, as a follow-up to an August 2004 site visit, CHA was asked to submit a resume of a QNA that could administer a newly established program in accordance with the regulations. In April 2004, the BON actually voted to withdraw CHA's initial accreditation because it had been without a qualified QNA for a lengthy period of time. Representatives of CHA, however, then met with Dr. Woldu, the

Administrator of the Health Professional Licensing Administration, and, based on Dr. Woldu's request, the Board agreed to give CHA an additional six (6) months to find a Qualified Nursing Administrator. The chronology of event thereafter is set forth in my First Declaration starting at ¶8.

9. Contrary to Plaintiffs' conflicting representations, the BON did interview Rachael Rizzo, CHA's current Program Administrator. Although Ms. Rizzo does not have a MSN, she is Masters prepared and has a clear understanding of the program and, most importantly, curriculum development, an essential requirement (17 DCMR §5607.3(c)) and a skill that Plaintiff Adedokun does not have. As early as the site visit in August 2004, Ms. Bonita Jenkins, then a BON Consultant, found Plaintiff Adedokun not qualified as the Administrator of the Program and also found that he could not explain curriculum concepts. A copy of her report is attached hereto. Ms. Jenkins noted, however, that Ms. Rizzo, then on the CHA faculty, was the most knowledgeable about educational issues and answered most questions.

10. Plaintiffs' statement that the Board "continuously applauded Plaintiff and as recently as August 7, 2006 sent Plaintiff a letter so stating," (Plts' Statement at 12) is a misrepresentation. The notice referred to by Plaintiffs only concerns the NCLEX pass rate and it goes to every nursing program (RN and PN), every quarter, notifying them regarding their NCLEX pass rate. Thus, Mr. Oboh's statement at ¶20 of his Decl. that he received a letter from the Board that CHA was in compliance with its rules is misleading; the letter refers only to pass rates.

11. As noted above, Mr. Oboh's representation that the Board did not interview CHA's prior QNAs (Oboh Decl. at ¶10) is somewhat misleading. First, it is

not at all clear what "prior Board comments about 'Africans'" Mr. Oboh is referring to since they are unspecified and unattributed. Second, the Board does meet with QNAs, especially programs that are initially accredited. Third, the Board was familiar with Mr. Adedokun and, as noted above, had previously found him unqualified to be CHA's QNA.

12. The statements of Mr. Oboh at ¶11 of his Decl. also are conclusory and misleading. The Board had a lengthy interview with Mr. Adedokun because it was attempting to determine his area of expertise. He did not appear to have an understanding of an essential requirement for a QNA – curriculum development or evaluation. Moreover, if Mr. Adedokun were the architect of the CHA program, he should have been more familiar with the program. Mr. Adedokun's prior experience as an administrator of a *health care facility* did not necessarily make him qualified to be QNA of a *new nursing program*. The skill sets are very different.

13. The statements by Mr. Oboh at ¶12 also are not accurate. As noted in my First Declaration (¶16), after receipt of the Board's June 14, 2005, letter, CHA was given six moths to find another QNA. Mr. Oboh immediately accepted the Board's decision concerning Adedokun and announced the selection of Ms. Rizzo as QNA. In July 2005 a letter was sent to Mr. Oboh inviting Ms. Rizzo to attend the September 2005 BON meeting.

14. Mr. Oboh's Decl. (¶13), correctly notes, contrary to the representations in Plts' Mem. (at p. 6), that Ms. Rizzo was interviewed by the Board and the Board found her to be knowledgeable about the program. Thus, the Board did not, as represented by Mr. Oboh, leave in place as QNA a person that had not been evaluated.

15. Mr. Oboh's opinion, expressed at ¶19 of his Decl., that many of CHA's competitors' programs are headed by nurse administrators with far less experience than Mr. Adedokun, is not correct. The only other nurse administrator who did not have a MSN was for the District's longest operating practical nursing program. That nurse administrator has a Masters and experience as an administrator which, at that time the program was accredited, was what the regulations required. The QNA now has completed her MSN. This program had been fully accredited but was placed on conditional accreditation status last year primarily due to its low NCLEX-PN pass rates.

16. Mr. Oboh (at ¶21 of his Decl.) complains that the statement in ¶26 of my First Decl. is difficult to understand. Allow me to clarify. The Educational Licensure Commission licenses schools. Schools may offer many educational programs. The Board has authority to accredit nursing programs. Loss of accreditation of the nursing program does not necessarily mean that the entity will lose its license to operate a school.

17. Mr. Oboh's statement at ¶23 of his Decl. is not totally accurate. First, as discussed here and in my First Decl., CHA has been offered many, many opportunities to remedy deficiencies in its program. Second, the example cited by Mr. Oboh, JC, Inc., was a fully accredited program. It is now conditionally accredited.

18. As to the statements at ¶¶8 and 9 of Mr. Adedokun's Decl., I never told him that having an MSN would qualify him to be a QNA of a newly established program. I attempted to impress upon him the differences between running an established program and a newly established program. In fact, I told Mr. Adedokun that having an MSN was not sufficient. I further informed him that although I have an MSN in nursing education, I would not have the skill set necessary to run a newly established program. Moreover,

given the report by the Board's nurse consultant in August 2004, I certainly would not have told him that he had the qualifications to be a QNA. I already have noted above (see ¶14), the differences between CHA, a newly established program, and the example used by Mr. Adedokun, Harrison Career Center, the longest established accredited program in the District. Mr. Adedokun's experience as an administrator of *a health care facility* did not provide him with the skill set required to be the administrator of *a school of nursing* and the Board's educational consultant reached this independent determination in August 2004.

19. Mr. Adedokun's representations at ¶10 of his Decl. are conjecture and speculation. I would not know who was applying to be the QNA at CHA. In fact, if I knew a qualified person interested in working in that position, I would encourage such a person to apply. It would not benefit me, the Board, or the District's nursing community to dissuade someone from working at CHA or any other nursing program in the District.

20. The two-year post graduate requirement of which Mr. Adedokun's complains (¶11 of his Decl.), is a regulatory requirement, 17 DCMR §5607.3(c), not something made up by the Board to impose different or undue burdens on Mr. Adedokun. In addition, Mr. Adedokun's situation was not comparable to the example he relies upon – Ms. Hurd who functioned as nurse administrator of the A&D Nursing Institute. At the time Dr. Hurd was nurse administrator of A&D there was no regulatory MSN requirements for administrators. A&D was accredited by the Board in 1999 and its accreditation since has been withdrawn.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 9/20/2006

*Karen Scipio-Skinner* (signature)
Karen Scipio-Skinner